(35 South. 747.)

No. 14,593.

CORKRAN OIL & DEVELOPMENT CO. v. ARNAUDET et al.*

(Nov. 3, 1903.)

ACTION TO RECOVER REALTY—PRESCRIPTION — PUBLIC LANDS — QUIETING TITLE — TAX DEED—PRESUMPTION OF VALIDITY.

1. Defendants' title to the property claimed by the plaintiff rests upon a tax sale, duly recorded, made by the tax collector for the parish of St. Landry in enforcement of delinquent state taxes for the year 1881, assessed upon it as private property belonging to Anthony Corkran, or his heirs. The property was in the actual possession of the defendants at the time of the institution of the present suit, on the —— day of ——, and they and their authors had been in possession for more than 10 years prior thereto.

Plaintiff claims that at the date of this tax sale the property belonged to the United States, and so remained until it was segregated from the public domain by patent issued in November, 1897; that the property at the time of the tax sale was not subject to state taxation, and the tax sale was an absolute nullity; that no prescription could run in favor of the purchaser against the government so long as it remained the owner. The patent under which plaintiff claims issued prior to the adoption of the Constitution of 1898, and any party in interest holding under the patent could have attacked defendants' title from that date. Defendants, having remained in corporeal possession of the property, unmolested, for three years after the adoption of the Constitution, are free from attack by the prescription of three years provided for in article 233 of the Constitution of 1898. In re Lockhart Praying for Possession, 33 South. 753, 109 La. Ann. 740; Pillow v. Roberts, 13 How. 472, 14 L. Ed. 228.

2. On February 10, 1897, Congress passed an act (29 Stat. 517, c. 213) entitled "An act to quiet title and possession with respect to certain unconfirmed and located private land claims in the state of Louisiana," in which it was enacted that all the right, title, and interest of the United States in and to the lands situate in the state of Louisiana known as the located, but unconfirmed, private land claims therein, aggregating 80,000 acres, and specifically described in the list or tabular statement accompanying the report, dated February 19, 1880, made by the Surveyor General of Louisiana to the Commissioner of the General Land Office under a resolution of the United States Senate, of December 2, 1879, and which report and list were communicated to the Senate by the Secretary of the Interior on March 8, 1880, should be, and were by said act directed to be, granted, released, and relinquished by the United States in fee simple to the respective owners of the equitable titles, and their respective heirs and assigns, forever, as fully and completely in every respect whatever as could be done by patents issued therefor according to law. The act declared that nothing in it should in any manner abridge, divest, impair, injure, or prejudice any valid right, title, or interest of any person or persons in or to any portion or part of the lands mentioned; the true intent of the act being to relinquish and abandon, grant, give, and concede any and all right, interest, and estate, in law or equity, which the United States then had or was supposed to be entitled to in said lands, in favor of all persons, estates, firms, or corporations who would be the true and lawful owners of the same under the laws of Louisiana, including the laws of prescription, in the absence of the said interest and estate of the United States.

The act directed that the Department of the Interior should cause patents to issue for such lands, and that such patents should issue in the name of the original claimant, as appeared in the list or schedule aforesaid, and, when issued, should be held to be for the use and benefit of the true and lawful owners, as provided therein.

This particular tract was included in the list in the name of Anthony Corkran, or his heirs, and a patent issued therefor on the 22d November, 1897; the patent embodying on its face the sections of the act under which it was issued.

The effect of the statute was to make the relinquishment or grant made by Congress act retrospectively, or by relation back, in such manner and to such times as to cover and protect any claims or rights of third persons to or upon the property prior to its date, as if it had belonged to Anthony Corkran or his heirs when such rights or claims arose.

The property was therefore subject to state taxation as private property when taxed, and must be held to have been such when the tax sale was made; and neither Anthony Corkran, nor his heirs, could claim under and through the United States government an exemption from the operation of prescription, which privilege or right the government itself had waived and renounced. Especially is this so when the heirs of Corkran repudiate the idea that their ancestor had at any time prior to the act any vested right in the property, which, being true, would leave the government perfectly free to convey or grant the land on such terms and conditions, and for the benefit of such persons, as it might think fit.

3. The presumption "omnia rite" applies under some circumstances and conditions to tax sales as well as to sales under eviction. When no attack has been made upon them after great lapse of time, where proceedings having for effect the divestiture of title have remained for many years unattacked, and parties have been permitted to remain under them for long periods in quiet possession of property as the true owners, adding to its value by permanent improvements, the want of positive testimony as to certain facts will be frequently supplied by the presumption referred to. The assessment roll

of 1881 referred to in the tax collector's deed will be assumed to have been legal and specific, and not insufficient, as suggested by plaintiff, and its nonproduction accounted for by the probability of its loss after so many years.

(Syllabus by the Court.)

Appeal from Eighteenth Judicial District Court, Parish of Acadia; Conrad De Baillon, Judge.

Action by the Corkran Oil & Development Company against Laurent Arnaudet and others. Judgment for defendants, and plaintiff appeals. Affirmed.

Story & Pugh, Edward Benjamin Du Buisson, and Kenneth Baillio, for appellant. Donelson Caffery & Son, J. Sully Martel, Lewis & Smith, Philip Julius Chappuis, and Gilbert L. Dupré, for appellees. Robert Montgomery, for appellees J. C. Beatty and S. M. Scott. Foster, Milling, Godchaux & Sanders, for appellee Prairie Mamou Oil & Mineral Co., Limited. J. E. Barry, for appellees L. Stephens, J. G. Dyer, and W. R. Keever. Martin, Voorhies & Voorhies, for appellee Dr. F. Réné Martin.

### Statement of the Case.

NICHOLLS, C. J. The plaintiff in its petition alleged itself to be the owner of section 47, township 9 south, of range 2 west, Louisiana meridian, containing 580.90 acres, more or less; that said land was claimed by Anthony Corkran (otherwise spelt Cockran) during his lifetime, and after his death was claimed by his heirs, whose names they set out, and said claim, known as the "Corkran Grant," was finally confirmed to the heirs and legal representatives of said Anthony Corkran by private act of Congress entitled "An act to quiet title and possession with respect to certain unconfirmed and located private land claims in the state of Louisiana," approved February 10, 1897 (29 Stat. 517, c. 213), and in pursuance to which a patent was thereafter issued to the said heirs and legal representatives of the said Anthony Corkran, of date November 2, 1897, and which patent, or a copy thereof, would be produced on the trial. The plaintiff then set out the manner by which it acquired title; giving the names of a great number of persons and their residences, heirs of Anthony Corkran. It alleged that Anthony Corkran was married to Margaret Watson; that he

died about the year 1819, and his succession was opened in the parish of St. Landry, where he resided, and in which parish the land was then situated; that his wife died some years afterwards; that both died intestate, leaving their children inheriting the said property; that neither Anthony Corkran and wife, nor any of the heirs and legal representatives or descendants of Anthony Corkran and wife, ever sold or disposed of their rights, title, or interest in said land before their sale to plaintiff and its authors, nor had the plaintiff or its authors ever disposed of the same, except as stated in the petition, and that it was then the legal and true owner of the property; that notwithstanding its ownership a number of persons, natural and artificial, whom they named, were illegally in possession of said land, setting up ownership of the same, and others being in possession claiming to be lessees; that some of said parties were nonresidents, and curators ad hoc should be appointed to these nonresidents; that all parties be cited, and that contradictorily with them it be adjudged and decreed owner of the land, and placed in possession of the same. Plaintiff reserved the right to sue any or all of said parties for the use of the property, or for any loss, damage or injury to it on account of their occupancy.

Curators ad hoc were appointed, and the parties cited. Laurent Arnaudet, Arthur Latreille, Eugene Houssiere, and Spaencer & Co. excepted that plaintiff was a pretended corporation that had no legal or rightful existence under the laws of the state of Louisiana, there being no law authorizing the formation of a corporation for the purposes for which the plaintiff was pretended to be organized, and for this reason the plaintiff was without right or capacity to sue or stand in judgment.

(2) That the pretended plaintiff corporation was organized for no other purpose than to acquire a litigious and alleged right to and to carry on this lawsuit, the pretended individual subscribers to the stock therein being estopped to do so in their own behalf for the reasons set out; that it was not lawful or permissible for a corporation to be organized for such a purpose; that exceptors had been in possession for many years, under a title not necessary then to set up, of

a tract of land now made valuable by the discovery of oil thereon; that the promoters had industriously and illegally bought up the supposed rights of the numerous so-called heirs of Anthony Corkran, and in order to enforce the pretended rights so derived.

They prayed that this exception and estoppel be maintained for the reasons set out above, and that plaintiffs demand be rejected and its suit dismissed at its cost. They prayed for such further relief as law and equity might allow.

The defendants Arnaudet, Latreille, Houssiere, and Fitzhugh, under reservation of the exceptions filed, answered. They pleaded the general issue. They declared that true it was that Anthony Cockran or Corkran claimed during his lifetime the land claimed by plaintiff herein, and true it was that the land claimed was patented by the United States government to Anthony Cockran and his heirs under and according to the provisions of the act of Congress of date 10th February, 1897, entitled an "Act to quiet title and possession with respect to certain located but unconfirmed private land claims in the state of Louisiana." And further answering, they averred that said act of Congress was fully set out in the preamble to the patent issued thereunder to Anthony Cockran and his heirs on the 2d day of November, 1897, and that by and under the provisions of said act the United States relinquished title to about 80,000 acres of land in the state of Louisiana, and especially provided that, while the patent should issue in the name of the original claimants or his heirs, the title of the United States should be granted in fee simple to the respective owners of the equitable title thereto, and their respective heirs and assigns, and that nothing in the act should abridge, divest, impair, injure, or prejudice any valid right, title, or interest of any person or persons in and to any portion or part of the lands mentioned in the first section of said act, which first section mentioned and included all the unconfirmed, but located, private land claims in Louisiana at the date of the passage of the act, of which unconfirmed, but private, land claims the claim of Anthony Cockran to certain lands, then in the parish of St. Landry, situated on Bayou des Cannes, in the lower Mamou, in section 47,

township 9, range 2 west, was one and was now the land in controversy in this suit.

That the true intent of said act of Congress was fully set out in the second section thereof, as follows: "The true intent of this act being to relinquish and abandon, grant, give and concede any and all right, interest and estate in law and equity which the United States has, or is supposed to be entitled to in said lands in favor of all persons, firms or corporations who would be the true and lawful owners of the same under the laws of Louisiana, including the laws of prescription, the absence of all said interest and estate of the United States."

That under and by virtue of the law of Louisiana all the right, title, and interest of Anthony Cockran and his heirs in and to the lands claimed by plaintiff, and patented as aforesaid to Anthony Cockran and his heirs, had been divested long prior to the issuance of the aforesaid patent, and was held in full and complete ownership long prior to the date of said patent by the author of defendants and by defendants under good, valid, and perfect titles, by and under the laws of Louisiana, including the laws of prescription.

That the authors of defendants, and defendants themselves, had acquired by true and valid title all the right, title, and interest and estate at law or equity of the United States in and to said land patented to Anthony Cockran and his heirs prior to the issuance of said patent, under and by virtue of indefeasible alienation of said land under the laws of Louisiana providing for the sale of all lands situate within its borders for nonpayment of the taxes necessary for the due operation of the government thereof, and by the alienation thereof from the purchaser at tax sale, and from such alienee, through mesne conveyances, to respondents, all of which alienations were translative of property, under which the respective purchasers went into possession, and exercised quietly, peaceably, and uninterruptedly all and every act of ownership from the time of their respective purchases and during their respective possession until the present time. That the unconfirmed but located private land claim in and to the land so patented to him and his heirs was susceptible of taxation under the laws of Louisiana, and was

properly assessed and sold for taxes, as would be afterwards specially set out. Defendants set out in detail the chain of title under which they claimed; the starting point of the same being a tax sale made on the 2d day of December, 1882, which they averred was made by C. C. Duson, sheriff and ex officio tax collector of the parish of St. Landry, and "at which he sold at public sale, after due advertisement, to Henry Gellert or Gellest, viz., four hundred and eighty (480) acres of land situated in the lower Prairie Mamou, on Bayou des Cannes, being in township nine (9) south, of range two (2) west, being the property of Anthony Cockran, as per assessment roll of the state of Louisiana of the year 1881, to satisfy a debt due said state for the unpaid taxes of the year 1881, for the price and sum of twenty-five dollars." That on the 27th of December, 1882, the said tax collector executed a tax deed in favor of said purchaser, which was recorded in the Conveyance Book of the recorder's office of the parish of St. Landry on the same day.

That Gellert went into possession of the land sold to him immediately after he had acquired at tax sale, and that the tax sale embraced the whole of section 47, township 9 south, of range 2 west, Louisiana meridian. That all of the purchasers subsequent to Gellert went into immediate possession of the land at the date of their respective purchases, and they, as well as Gellert, occupied the same as owners, with undisturbed and quiet possession; plowed, ditched, and cultivated the same in various crops, and exercised without disturbance all the powers and franchises of ownership. That the land purchased by Gellert at the tax sale was the same land which was patented to Anthony Cockran or his heirs, and that the superficial area in acres mentioned in the tax deed to Henry Gellert was controlled by the description set out in said deed, and that the same conveyed (as it was intended to convey) all of the right, title, and interest of Anthony Cockran or his heirs in and to the unconfirmed but located private land claims of Anthony Cockran or his heirs to section 47, township 9 south, of range 2 west, on Bayou des Cannes, in the lower Prairie Mamou, parish of Acadia.

That their author, Jean Gay, applied first for the patent issued by the government as aforesaid, and that the patent only issued in compliance with the third section of said act of Congress, not as recognizing any title to said Anthony Cockran or his heirs absolutely, but for the benefit of all parties who had acquired title to said lands under the laws of Louisiana prior to the issuance of said patent, and that, in law and fact, the patentees held under said patent as trustees for the beneficiaries holding the legal and equitable title springing from the laws of Louisiana recognized in said act of Congress. They pleaded in bar of plaintiff's action and in support of their titles the prescription of three, five, and ten years.

They averred that the prescription of three years established by article 233 of the Constitution of 1898 was a complete bar to the action. They averred that they had paid taxes on the property amounting to $300; that they had placed upon said land valuable improvements amounting in the aggregate to $20,000; and that, should they be evicted, they were entitled to the value of the same. They prayed that plaintiff's demand be dismissed, but, in case of eviction, plaintiff be decreed to pay to respondents, in proportion to their respective ownership, the value of useful improvements erected by them on the land, and $300 for taxes paid, and that possession be not ordered until said sum should be paid.

The district court, while declaring there was merit in the exception filed by defendants, preferred, it said, to decide the case upon the merits. Proceeding to do so, it rendered judgment in favor of the defendants and against plaintiff, rejecting its demand, and adjudging and decreeing Laurent Arnaudet, Arthur Latreille, and Eugene Houssiere to be the owners of the lands in controversy, called for by their respective titles, and quieted them in their possession of same. Plaintiff appealed.

### Opinion.

We are of the opinion that the judgment appealed from on the merits is correct, and that therefore there is no necessity for reviewing the action of the court in respect to the exception filed by the defendants. Were this not the case, the writer of this opinion would have felt compelled to have recused himself, notwithstanding the fact that coun-

sel on both sides declared there was no legal or good ground for his recusation.

The district court found that the defendants and their authors had been, as a fact, in the actual possession as owners of the property claimed by the plaintiff for over 10 years, and that the conditions and circumstances under which this possession was held were such as to fix the title of the property in the defendants by the prescription acquirendi causa of 10 years, even if it had not been otherwise sustainable.

The court further found that the title of the defendants was protected from attack by the plaintiff by reason of the prescription of three years provided for in article 233 of the Constitution of 1898. Appellant urges that the court erred on both points.

On February 10, 1897, the following act of Congress was passed:

"An act to quiet title and possession with respect to certain unconfirmed and located private land claims in the state of Louisiana.

"Section 1. Be it enacted, that all the right, title, and interest of the United States in and to the lands situate in the state of Louisiana, known as the located but unconfirmed private land claims therein, aggregating about eighty thousand acres, and specifically described in the list or tabular statement accompanying the report, dated February nineteenth, eighteen hundred and eighty, made by the Surveyor-General of Louisiana, to the Commissioner of the General Land Office, under a resolution of the United States Senate, of December second, eighteen hundred and seventy-nine, and which report and list were communicated to the Senate by the Secretary of the Interior, on March eighth, eighteen hundred and eighty, as Senate document numbered one hundred and eleven, Forty-Sixth Congress, Second Session, shall be, and the same are hereby directed to be, granted, released, and relinquished by the United States, in fee simple, to the respective owners of the equitable titles thereto, and their respective heirs and assigns forever, as fully and completely, in every respect whatever, as could be done by patents issued therefor according to law.

"Sec. 2. That nothing contained in this act shall in any manner abridge, divest, impair, injure or prejudice any valid right, title, or interest of any person or persons in or to any portion or part of the lands mentioned in said first section, the true intent of this act being to relinquish and abandon, grant, give, and concede any and all right, interest and estate in law or equity which the United States has, or is supposed to be entitled to in said lands, in favor of all persons, estates, firms or corporations who would be the true and lawful owners of the same under the laws of Louisiana, including the laws of prescription, in the absence of the said interest and estate of the United States.

"Sec. 3. That the Department of the Interior shall cause patents to issue for such lands, and such patents shall issue in the name of the original claimant as appears in the list or schedule aforesaid, and when issued shall be held to be for the use and benefit of the true and lawful owners as provided in sections one and two of this act."

Under this act a patent issued on November 22, 1897, embodying on its face the three sections of the act, and reciting further that, as the private land claim of Anthony Corkran appeared in the list of claims embraced in the foregoing Senate executive document numbered 111, the United States, in consideration of the premises, and in conformity with the provisions contained in sections 2 and 3 of the act, gives and grants to Anthony Corkran, and his heirs and assigns, section 47 in township 9 S., R. 22, containing 580.90 acres.

There is not in the record any previous application for the land, or entry thereof, by Anthony Corkran, but the records of the Land Department show that in 1816 the land was surveyed by Deputy United States Surveyor Jos. Aborn, who filed a map of the land, with the following procès verbal:

"Pursuant to an order from the Principal Deputy Surveyor of the Western District, state of Louisiana, and in conformity with a certificate B. No. 1151, from the Board of Commissioners of the said Western District, I have surveyed for Anthony Corkran a tract of land," etc. (The words from "B. No. 1151" were scratched out.)

This map and procès verbal were approved on May 21, 1817, by Gideon Fritz, principal deputy surveyor.

The land was surveyed again in 1875 by P. A. Thibodeaux, deputy surveyor, and across.

his map is written, "Claimed by Anthony Corkran—no confirmation found."

On the 27th of December, 1882, the tax collector of the parish of St. Landry executed a deed in favor of Henry Gellert, which was recorded on the same day in the Conveyance Book of that parish, and a copy of which is in the record, from which it appears that on the 2d day of December, 1882, he had adjudicated to him at public sale, as the last and highest bidder, "Four hundred and eighty acres of land situated in the lower part of Mamou on Bayou Cane, being in township 9 south, of range 2 west, being the property of Anthony Cockran or his heirs as per assessment roll of the state of Louisiana of the year 1881," to satisfy a debt due the said state for the unpaid taxes for the year 1881 for the price and sum of twenty five dollars cash in hand paid by Henry Gellert to the tax collector. The present defendants are admittedly in possession of the land patented to Anthony Cockran or his heirs. The plaintiff, claiming as the assignee or vendee of the heirs of Corkran at a sale made to it on the ―― day of ――, contends that the land patented to Anthony Corkran or his heirs was not subject to state taxation prior to the year 1897, as until that date the land was not segregated from the public domain, but belonged to the United States, and was by reason of that fact exempt from taxation, and therefore any sale made by the state of Louisiana in enforcement of taxes alleged to be due to it was an absolute nullity; also that no prescription could run in favor of the tax purchaser because of the radical character of the defect in the title, and further because no prescription could run against the United States.

The district judge, in his reasons for judgment, says:

"The evidence shows that in 1816 Joseph Aborn, deputy United States surveyor, acting under instructions from the principal deputy surveyor of the Western District, state of Louisiana, surveyed the private land claim of Anthony Corkran in Tp. 9 S., R. 2 W. This survey was approved May 21, 1817, by Gideon Fritz, principal deputy surveyor Western District Louisiana. [See survey of Aborn, in the record.]

"It is true that Aborn designated the section as section 40, and as containing 640 acres, but this was in 1816. Now, upon a resurvey in 1874 by P. A. Thibodeaux, deputy United States surveyor, under instructions, which survey was approved April 26th 1875, the section is designated as section 47, and containing $580^9/_{100}$ acres, but gives the same boundaries as Aborn, to wit, John McDaniel above, George King below. [See, also, plat accompanying patent.]

"In 1882 Henry Gellert purchased this land at tax sale. He went into possession, improved it, cultivated it, used the timber on it for fencing and other purposes. In November, 1882, some of defendants herein moved upon this land, made application for homestead entries thereon. Henry Gellert instituted a possessory action against these defendants. There was judgment in favor of Gellert in the district court, which judgment was affirmed by the Court of Appeal, Third Circuit. Subsequently the homestead entries made by these defendants were canceled by the register and receiver of the United States land office at New Orleans. On appeal to the Commissioner of the General Land Office, at Washington, the Commissioner affirmed the judgment of the register and receiver of the land office at New Orleans. In the elaborate and well-considered opinion of the Commissioner of the General Land Office, I quote the following as pertinent to the question at issue: 'The appeals are dated February 22, 1892. Mr. Elms [the attorney of the appellants] admits that a person by the name of Gellert purchased this Corkran claim at tax sale, and took possession of the land. Mr. Elms also states that he understands that Mr. Gellert is now before Congress, seeking confirmation of his title; claiming, as he (Mr. Elms) supposes, under Corkran. I find on file here a plat of survey of said township approved in 1817, and afterwards, again, after some additional surveying, approved in 1830. * * * I also find on file here a plat of the resurvey of said township approved in 1875. Section 47, by this resurvey, is not subdivided, but is reported as containing 580.90 acres, and as being "claimed by Anthony Corkran—no confirmation." In response to Senate resolution of December 2, 1879, the honorable the Secretary of the Interior forwarded March 8, 1880, to the President of the Senate, a report made February 19, 1880, by the United States Sur-

veyor General of Louisiana on located but unconfirmed private land claims in said state. The Corkran claim is included in this report. This report is printed as Senate Ex. Doc. No. 111—46th Congress, 2d Session.

" 'Prior to this report this office had called the attention of Congress to the anomalous condition of these claims. This office, in its report of 1877, in speaking of these claims, used this language, namely: "Practically, the United States can make no disposition of the land covered by these claims, and they would not if they could. There are in Louisiana about 288 claims in a similar condition to the Cockran claim. These claims cover about 80,000 acres of land, embracing in their limits valuable plantations and farms, and have long since been surveyed and represented upon the township plats."

" 'Following the policy adopted by this government, namely, that the lands embraced by these claims are not public lands, in a sense that makes them subject to disposition under the general land laws of the United States, and being of the opinion that it is my duty to await the future direction of Congress in reference to the disposition of the lands in question, and there appearing no good or sufficient reason for my making an exception in the matter of said applications to enter the lands surveyed for Corkran, I have therefore affirmed your action in each of the cases.' See, also, Senate Ex. Doc. No. 111, 46th Congress, 2d Session; Extracts from Reports of Surveyor General for 1874 and 1877.

"It follows that Anthony Corkran prior to 1816, claimed a tract of land in Lower Mamou, on the west bank of Bayou des Cannes; that the principal deputy surveyor for the Western District of Louisiana ordered the survey of the claim, the land was in fact surveyed, and the survey approved. Following this, the land was resurveyed under authority by P. A. Thibodeaux, deputy surveyor, and his survey was approved. The township map of T. 9 S., R. 2 W., shows no confirmation found, for section 47, certified to as being correct as far back as April 26, 1875.

"The officers of the United States Land Office refused to dispose of this land under the general land laws of the United States, and finally Congress, acting upon the report of the Surveyor General, passed the following act: 'An act to quiet title and possession with respect to certain unconfirmed and located private land claims in Louisiana.' It is therein provided 'that all the right, title, and interest of the United States in and to the lands situated in the state of Louisiana known as the located but unconfirmed private land claims therein, aggregating about eighty thousand acres, and specifically described in the list or tabular statement accompanying the report, dated February 19, 1880, made by the Surveyor General of Louisiana to the Commissioner of the General Land Office,   *   *   *   shall be and the same are hereby directed to be granted, released and relinquished by the United States in fee simple to the respective owners of the equitable titles thereto, and to their respective heirs and assigns forever, as fully and completely in every respect whatever, as could be done by patents issued therefor according to law.

" 'Sec. 2. That nothing contained in this act shall in any manner abridge, divest, impair, injure or prejudice any valid right, title, or interest of any person or persons in or to any portion or part of the lands mentioned in said first section—the true intent of this act being to relinquish and abandon, grant, give, and concede any and all right, interest and estate in law or equity which the United States is or is supposed to be entitled in said lands, in favor of all persons, estates, firms or corporations who would be the true and lawful owners of the same under the laws of Louisiana, including the laws of prescription, in the absence of the said interest and estate of the United States.

" 'Sec. 3. That the Department of the Interior shall cause patent to issue for such lands, and such patents shall issue in the name of the original claimant as appears in the list or schedule, and when issued shall be held for the use and benefit of the true and lawful owners as provided in sections one and two of this act.' This act was passed on February 10, 1897. A patent issued in accordance with this act to Anthony Cockran and to his heirs and assigns.

"It is now contended that the land was not severed from the public domain until the passage of this act, and the issuance of the patent thereunder. The act of Congress

is in fact but a quitclaim, a relinquishment, or abandonment by the government of whatever rights it had or may have had to the land in favor of qui de droit. It remits all parties in interest to the courts of Louisiana, the matter to be determined by the laws of Louisiana. Williams v. Close, 12 La. Ann. 873; Sacket v. Hooper, 3 La. 107.

"The term 'property' in the treaty by which the United States acquired Louisiana comprehends every species of title, inchoate or complete, legal or equitable, and embraces rights which lie in contract, executory as well as executed; and no principle was better settled than that inchoate titles to land were property. The court went so far as to say such titles and such property would have been equally sacred in a republican form of government, under the laws of nations, without any treaty stipulations. Bryan v. Kennett, 113 U. S. 179, 5 Sup. Ct. 407, 28 L. Ed. 908; Delassus v. U. S., 9 Pet. 117, 9 L. Ed. 71; Smith v. U. S., 10 Pet. 326, 9 L. Ed. 442; Slidell v. Grandjean, 111 U. S. 412, 4 Sup. Ct. 475, 28 L. Ed. 321; Williams v. Close, 12 La. Ann. 873; Sacket v. Hooper, 3 La. 107.

" 'Some of the claims which had always been treated by this office, the land offices, and the departments as unconfirmed, and so shown upon the township maps, have by such examinations been found to be confirmed, and patents have issued; and the inference is just that similar researches might reveal a few other confirmations not now supposed to exist.' Extracts from Report for 1874.

"The act is a relinquishment in favor of such persons as would, under the laws of Louisiana, be the true, legal, and equitable owners of such land in the absence of any claim or title in the United States, enabling all persons who, under the laws of Louisiana, might, to maintain a prescription against the United States, and all persons claiming under or through them. The government practically and substantially never claimed this land as belonging to it, and as forming part of the public domain.

"These are the terms of the act as I understand them, and the patent must be accepted under the terms of the act or repudiated. I am therefore of opinion and hold that the land in controversy was subject to

taxation and sale for nonpayment of taxes."

In the brief of counsel of plaintiff, they say:

"The following propositions of fact are clearly borne out by the record:

"First. That no title of any kind has been shown to exist in Anthony Cockran or his heirs prior to 1897—neither Spanish nor French grant, cash certificate, homestead or other certificate of entry, Spanish requete or grant, or any other title in the nature of an equitable title in him or to his heirs prior to 1897.

"Second. That the only equity possessed by Anthony Cockran or his heirs to the land in contest prior to 1897 was an equity or claim founded on naked possession.

"Third. That no confirmatory grant or concession ripening the equity derived from naked possession into a title was ever made to Anthony Cockran or his heirs prior to 1897.

"Fourth. That the first, only, and original title of Anthony Cockran or his heirs was derived from the special act of Congress of February 10, 1897, this being the first confirmation and grant founded upon his equity of naked possession; and thus it appears that the legal and the equitable title in Anthony Cockran or his heirs arose at the same time, to wit, February 10, 1897.

"Under this statement of facts, we found [predicate] the following propositions of law:

"First. That in 1882, when the sale of the land in contest was made, the property purported to be conveyed by the tax deed was the property of the government, and was therefore exempted from taxation by both state and federal law.

"Second. That, if sold, the pretended tax sale thereof was absolutely void, and that the tax sale thereof could convey no right or title to the tax purchaser, and that the right of the claimant through a patent from the government could not be divested or defeated by any state statute or constitutional provisions of a curative or remedial nature purporting to divest the right or limit the remedy. * * *

"The land in controversy in this suit, as we shall contend, falls under the last category, to wit, a grant from the Congress of the United States. There is not a scintilla of evidence in the record of any written or ver-

bal grant, either from the French or Spanish government, dating back to the occupation of the present territory of Louisiana by the sovereigns of these countries. Neither is there any evidence of any survey or location of the land under an order of survey of the Spanish or French government or authorities prior to the treaty of Louisiana. Neither is there in the record any evidence of any sort of claim submitted to the board of commissioners organized in pursuance to the treaty of cession to pass upon inchoate or incomplete titles to properties situated in the territory of Louisiana, and existent at the time of the treaty of cession. There is not the faintest suggestion of the issuance of any certificate, warrant, or patent prior to the year 1897. In fact, the only evidence in this record of the existence of any right or claim in Anthony Corkran or his heirs or assigns is the special act of Congress introduced in evidence in this suit, and bearing date February 10, 1897.

. "If we be correct in the foregoing propositions of fact, it becomes clear, as a legal proposition, that the legal severance of the title of the United States. in and to Sec. 47, T. 9 S., R. 2 W., only took place at the date of the said special act of Congress, to wit, February 10, 1897."

The arguments of the plaintiff that neither Anthony Corkran nor his heirs were with right of any kind in the land in controversy would lead directly up to the result that, so far as they were concerned, the government was free to make such disposition of it as it might think proper. Even though the disposal of the same was ultra vires and void, they could not urge it, for to do so would have as its result to throw them out of court for want of interest in the subject-matter. Their rights resting exclusively upon the government's act. Should that be set aside, their present pretensions would be left utterly without any foundation. Succession of Monette, 26 La. Ann. 26.

The government having the power to make the grant and fix the terms and conditions of the same, and to declare who should be the beneficiaries, and Anthony Corkran and his heirs, under their contention, having no right to call its action in question, they would be forced to either accept it with its conditions, or not at all. Corkran and his heirs would

have no more right to be made the gratuitous beneficiaries of the government than any one else, and the parties who had acted in respect to this land upon the belief that it was private property were as much entitled to governmental consideration as were parties claiming, not equitable rights, but equitable claims. Plaintiff's counsel, in their brief in its behalf, say: "We admit that Anthony Corkran, prior to February 10, 1897, and prior to his death, on and about 1818, had made some sort of a claim to the land in dispute in this suit, but it is equally clear from the evidence that claim had not ripened into a grant from any antecedent sovereign of the soil, nor had it been ever confirmed or recognized by the United States prior to the passage of the act of Congress of February 10, 1897. It is evident that a claim is, not only legally speaking, but in ordinary parlance, clearly distinguishable from a grant or a title. A 'claim' is defined in the Century Dictionary (verbo 'Claim') as 'the thing claimed or demanded; specifically, a piece of public land which a squatter or settler marks out for himself with the intention of purchasing it when the government offers it for sale; as, "he staked out a claim." '

"A grant, on the contrary, has a distinctly broader meaning. It implies an acquired right, and is described by Mr. Bouvier as applicable to the conveyance of incorporeal rights. But in the larger sense the term comprehends anything that is granted or passed from one to another, and is applied to every species of property. It therefore necessarily implies a title or vested right in the grantee from the grantor, or has a much more pregnant signification than a claim. Not only did Anthony Corkran or his heirs up to 1897 have a mere claim, but that claim remained in an inchoate condition until the act of Congress of February 10, 1897, ripened it into a grant. Then, and then only, did the land in dispute pass into the domain of private property, and become the subject of contracts, and amenable to the laws of prescription and other law. Then only did it become subject to taxation, for, as long as it remained the property of the sovereign, under the authorities quoted, it clearly was not liable to state taxation. Under these circumstances, the land was not liable to any species of state taxation until the 10th of February,

1897." It will be seen from this that there was of record somewhere in the Land Department evidence of a claim of some kind—not such a claim as was enforceable in law, but one dependent upon the grace and favor of the government, and that the plaintiff, as the assignee of the Corkran heirs, is urging that the government was acting more generously and liberally towards them than it should or could have been compelled to act.

Such a contention, coming from the quarter it does, is not to be received for the purpose sought to be attained in this action.

If Corkran or his heirs had no claim of character such as could be forced or legally entitled to have been recognized, the government could impose such conditions to the voluntary recognition of the same as it thought proper, and the parties claiming under the act of recognition would be forced to accept them or nothing. Succession of Monette, 26 La. Ann. 26.

There is no one before the court claiming rights under the government adverse to the rights acquired by the parties under the government, and whatever rights the government itself might have had, or grounds for objection, it had expressly renounced and waived, not only in favor and behalf of Anthony Corkran or his heirs, but of any other person who would have had legal rights had the government itself had none when those rights attached. This renunciation or waiver could as legally and properly have been made by the government in behalf and in favor of this class of persons as it could have been made in favor of the Corkran heirs, and that this renunciation and waiver was intended to cover and protect the rights of the latter class appears on the face of the act of Congress. The government could, if it thought proper, have made its conveyance act retrospectively or by relation to a certain term, or so as to cover and protect any claims or rights of third parties existing prior to its date; and it did this, in point of fact.

Grant that the act of Congress was an original grant to the Corkran heirs as of date of its passage; it was none the less a grant coupled with conditions and charges in favor of third parties, and the Corkran heirs were forced to accept the grant with the conditions attached. They could not accept it as far as it might be favorable to them, and repudiate its effect as to other parties. The plaintiff is seeking to urge objections which could only be advanced by parties holding adversely to the government's action or by the government itself. There are no persons claiming adverse rights, and, the government having expressly renounced and waived her own, plaintiff cannot, through her, urge them.

It is a matter of no moment what rights might have been held under other and different circumstances, for we must take the case as we find it, and, so taking it, the property must be considered precisely as if it had been private property when it was assessed and sold for state taxes. We will show later that, under the situation disclosed by this record, plaintiff's position would not be bettered by recognizing that the property was, at the time of such assessment and sale, part of the public domain of the United States.

Plaintiff urges that, even if the property had been subject to assessment and sale for state taxes, the tax sale to Henry Gellert in 1882 was absolutely null and void, and conveyed and could convey none to him. Counsel, aware of the provisions of article 233 of the Constitution of 1898 as to the prescription of three years barring an action seeking to annul a tax title, brought a direct petitory action against defendants, as being in the actual possession of the property which they claim. Referring to its demand, plaintiff says: "It is a petitory action. That action, pure and simple, unaccompanied by any demand in nullity, is never prescribed, though the defendant in such action may show a better title by the aid of prescription. This is the case here. Plaintiff has not attacked the defendants' title. It has set up its own, and alleged that the defendants possessed the property claimed as trespassers. The defendants set up an adverse title, and claim that by the aid of prescription it is the better title. Of course, our whole argument upon this head depends upon the correctness of the proposition heretofore advanced, that the tax deed is absolutely null, for want of a description by which the property could be identified. * * *

"In this case the nullities in the tax proceedings of 1882 were not pleaded by the plaintiff in this suit, nor was any evidence offered to establish them. The nullities al-

leged appear upon the very face of the tax sale and the other documents offered in evidence by defendants themselves, and our whole argument in this case, in so far as these proceedings are concerned, is founded entirely upon what appears upon the face of the evidence tendered by the defendants themselves. This evidence was offered and introduced with all these patent nullities stamped upon them. The nullities are inherent, and not extrinsic, and import their invalidity on their face. We have attempted to show that the tax deed of 1882 is absolutely null upon its face, because it conveys no certain property in terms, and because of the fact that the property mentioned in terms is impossible of identification. It therefore does not possess the character of a 'sale of property for taxes,' in the purview and intendment of article 233 of the Constitution of 1898; nor does there exist any necessity 'to set it aside,' in the language of that article, for it is a nudum pactum, intrinsically null and void, and requiring no action of the court, beyond the mere declaration of a judicial conclusion as to that fact, inevitably derived from the mere inspection of the document itself."

The defendants, in answer to plaintiff's petitory action, pleaded, as we have seen, the general issue. They then pleaded that they and their authors had been in the actual, corporeal possession of the property claimed, as owners, under the conditions required for acquiring the same by the prescription of 10 years. They also pleaded in bar of plaintiff's action the prescription provided for by article 233 of the Constitution of 1898.

On the trial of the case, defendants established that they and their authors had been in possession as they had alleged, and they claimed, and now claim, they were entitled to hold the property by the prescription of 10 years in the absence of affirmative proof by the plaintiff of some circumstances which would take the case out of the operation of the laws of prescription invoked. Defendants offered in evidence a deed which showed upon its face that defendants and their authors traced their title back to a tax deed made by the state tax collector as far back as 1882. Plaintiffs had not attacked this tax sale in their petition, nor did they attack

it after the deed was offered, but contented themselves with arguing and maintaining that the tax deed introduced showed on its face the nullity of the tax sale.

In dealing with the issues submitted to the court, we will first say that the presumption, "Omnia rite," applies to tax sales, under some circumstances and conditions, as well as to sales under execution, after a great lapse of time. This court has itself applied that presumption to a tax sale in Willis v. Cypress Co., 108 La. 255, 32 South. 386. Where proceedings having for effect the divestiture of title have remained for many years unattacked, and parties have been permitted to remain under them for long periods in the quiet possession of property as the true owners, adding to its value by permanent improvements, weakness of the evidence offered as to certain facts will frequently be fortified, and the want of positive testimony supplied, by presumptions, when this would not be allowed in matters of recent date.

In the present instance plaintiff urges the tax title was an absolute nullity, because the description of the property to be sold is too indefinite to transfer any property whatever. The full description in the tax deed is, "Four hundred and eighty-one acres of land situated in the lower part of Mamou, on Bayou Cane, being in township nine south, of range two west, being the property of Anthony Cockran or his heirs, as per assessment roll of the state of Louisiana of the year 1881."

Counsel call attention to the fact that defendants did not offer the assessment therein referred to, but only the tax deed, and they argue that the description in the assessment must be presumed to be faulty and identical with that in the deed. We can scarcely adopt that inference as logical, for, had the two descriptions been precisely the same, there would have been no reason for referring back to the assessment roll. The inference would rather be that the assessment description was broader, more precise, and more definite than was that in the deed. We should not and will not, after this great lapse of time, presume illegality or insufficiency in the assessment to which reference was made, but, on the contrary, we will presume that it was correct and regular. If the assessment roll was not produced, it was

doubtless because it had been mislaid or had not been preserved. Not much attention is paid to documents of that kind after they have served their present purpose. We think the defendants were not called upon to make explanations, in the absence of actual attack upon the tax proceedings, but were justified in relying upon the presumption of regularity which would apply to them under existing conditions. It was plaintiff's duty to have raised by pleadings, under the circumstances, a direct issue as to the illegality of the assessment and tax sale.

Plaintiff, in referring to the requirements of an act divesting title, says, "It should show on its face, or by reference to accessible public documents, what is taken from the owner and transferred to the purchaser," and cite in support of that position a great number of authorities—among others, that of Wilson v. Marshall, 10 La. Ann. 329.

The tax deed offered did refer to the assessment roll of 1881—a public document which was then accessible, though it was subject to loss.

Defendants evidently relied in their pleadings and proof upon article 233 of the Constitution, upon the strength of the defensive position which they would hold, when they should have shown an actual corporeal possession of the property claimed by themselves and their authors for 19 or 20 years as owners, and have traced their rights back to a tax sale.

We do not think plaintiff's position at all strengthened, under the present laws, by the fact that it brought a petitory action, pure and simple. The issue between the parties finally took the shape of an attack made by the plaintiff, out of possession of certain property, upon defendants, in the actual possession of the same, and justifying their possession by tracing the origin of such possession back to a tax sale. The form of the action did not change the issue. Defendants do not plead prescription against the petitory, but upon an incidentally raised action of nullity. The sale referred to was strictly a sale for taxes. The property was proceeded against as property belonging to Anthony Corkran or his heirs, and, as matters have now shaped themselves, it must be taken to have belonged to them at the time of the sale. The defendants and their authors not only had corporeal possession prior to 1898, but it extended (before the institution of this suit) for three years after the adoption of the Constitution of 1898, so that this possession was itself protected permanently from attack by plaintiff by article 233, independently of the merits of the tax title (Leffingwell v. Warren, 2 Black, 599, 17 L. Ed. 261; Burroughs on Taxation, 343; Cooley on Taxation (3d Ed.) pp. 550, 557, 559, 560, 561; Blackwell on Tax Titles, § 805, p. 642), even had the property at the time of the tax sale not been segregated from the public domain, and even though their title to the property had been void (In re Lockhart, 109 La. 740, 33 South. 753). This permanent protection to possession is equivalent to legal ownership. Pillow v. Roberts, 13 How. 472, 14 L. Ed. 228. In Am. & Eng. Ency. of Law, on pages 267, 284, 285, 286, 287, and 288, are collated numerous authorities to the effect that a tax deed which purports to convey the title to real estate to the grantee constitutes color of title, although it may be void; and one of the citations is to the effect that where defendant had taken possession of the land in question under a tax deed void because the land belonged to the United States and was not subject to taxation, but continued in uninterrupted possession under his tax deed for more than 10 years after plaintiff procured his title, it was held that, although defendant's color of title began while the government yet held the land, yet if his possession thereafter was continued for more than 10 years after plaintiff acquired his title, plaintiff's right of action to recover the land was barred by the statute of limitations, though the statute would not have run against the government, had the title remained in it. See Pillow v. Roberts, 13 How. 472, 14 L. Ed. 228. Plaintiffs had certainly the right, even on their own theory, to attack defendants' tax title after February, 1897. Having failed to institute their proceeding within the three years from the date of the adoption of the Constitution, their right of action was forever barred. In re Lockhart, 109 La. 740, 33 South. 753.

We think that defendants have sustained their defense under both of the prescriptions invoked—that of 10 years, acquirendi causa, and that of 3 years, under article 233 of the Constitution.

Plaintiff contends that the property sold at the tax sale was not susceptible of identification, but, as a fact, Gellert did identify it, as now shown by the patent, and took possession of it under color of title as owner. The present defendants seem to have been for a number of years in actual possession of nearly the whole of the tract, and, though Gellert, the purchaser at the tax sale, did not inclose the entire property, he fenced a part, and cultivated and used a part as a pasture. Possessing under a title, he had constructive possession of the whole. Corkran and his heirs had possession of no part of the tract.

This case resembles in many of its features that of Jopling v. Chachere, 107 La. 522, 32 South. 243. It is absolutely devoid of equity. Anthony Cockran died as far back as 1818, and the last we hear of him or of his heirs, until this suit was brought, was in 1822. Some of the assignors of the plaintiff are the great-great-great-grandchildren of Anthony Cockran. None of the assignors knew him otherwise than by reputation. They were indifferent during this long interval of time to any rights they may have had in this land, and indifferent, also, to any duty connected with it as owners; and it was only after the property had acquired value from being ascertained to be in the recently discovered "oil field" that they appear upon the scene, after being hunted up by a party acting in his own interest for a consideration, seeking to attack parties who have been in possession of the property for many years in good faith, and who had made valuable improvements upon it at great expense. The remarks we made in the Jopling Case from this standpoint find full application here.

The judgment appealed from is correct, and it is hereby affirmed.